UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

PORTLAND DIVISION

MATTHEW C. THEABOLT,

                Plaintiff,

         v.

CAROLYN W. COLVIN, Acting
Commissioner of Social Security
Administration,

             Defendant.

Case No. 3:12-cv-1627-SU

FINDINGS AND RECOMMENDATION

SULLIVAN, Magistrate Judge:

Matthew C. Theabolt ("Theabolt") brings this action pursuant to the Social Security Act ("Act"), 42 U.S.C. § 405(g), to obtain judicial review of a final decision of the Commissioner of Social Security ("Commissioner"). The Commissioner denied Theabolt's application for Supplemental Security Income ("SSI"). For the reasons set forth below, the Commissioner's decision should be reversed and remanded for an award of benefits.

1 - FINDINGS AND RECOMMENDATION

*Procedural Background*

On January 28, 2009, Theabolt protectively filed an application for SSI alleging disability beginning on June 16, 1990.  (Tr. 26, 91-92, 171-77. )[1]  Theabolt's application was denied initially and upon reconsideration.  On October 1, 2010, after a timely request for a hearing, Theabolt appeared and testified before an administrative law judge ("ALJ").  (Tr. 89-90, 104-05, 106-14.)  The hearing was continued until December 9, 2010.  (Tr. 44-78, 79-88.)  Theabolt was represented by counsel, Susan Issacs.  Additionally, Theabolt's mother, Erin Balm, two lay witnesses, Leslie Wilkins and Jon Pank, and a vocational expert ("VE"), Gail Young, also appeared and testified.  (Tr. 44-88.)  On December 21, 2010, the ALJ issued a decision finding Theabolt not disabled within the meaning of the Act.  (Tr. 26-38.)  The Appeals Council denied review, making the ALJ's decision the final decision of the Commissioner.  (Tr. 1-7.)  Theabolt now seeks judicial review of that decision.

*Factual Background*

Born on June 16, 1990, Theabolt was 20 years old at the time of the hearing, and the continued hearing, before the ALJ.  (Tr. 50.)  In 2009, Theabolt completed his GED.  (Tr. 52.)  Aside from sporadic volunteer activities, Theabolt has no past relevant work.  (Tr. 37, 57, 186-90.)  Theabolt alleges disability due to Asperger's syndrome, major depressive disorder, social anxiety, and paranoia.  (Tr. 197.)

*Legal Standard*

The court must affirm the Commissioner's decision if it is based on proper legal standards and the findings are supported by substantial evidence in the record.  *Hammock v. Bowen*, 879 F.2d

---

[1]"Tr." refers to the official transcript of the administrative record.  (Docket #12.)

498, 501 (9th Cir. 1989). Substantial evidence is "more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (quoting *Consol. Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). The court must weigh "both the evidence that supports and detracts from the [Commissioner's] conclusions." *Martinez v. Heckler*, 807 F.2d 771, 772 (9th Cir. 1986). "Where the evidence as a whole can support either a grant or a denial, [the court] may not substitute [its] judgment for the ALJ's." *Massachi v. Astrue*, 486 F.3d 1149, 1152 (9th Cir. 2007) (citation omitted); *see also Burch v. Barnhart*, 400 F.3d 676, 680-81 (9th Cir. 2005) (the court "must uphold the ALJ's decision where the evidence is susceptible to more than one rational interpretation").

The initial burden of proof rests upon the claimant to establish disability. *Howard v. Heckler*, 782 F.2d 1484, 1486 (9th Cir. 1986). To meet this burden, plaintiff must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected . . . to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).

The Commissioner has established a five-step sequential process for determining whether a person is disabled. *Bowen v. Yuckert*, 482 U.S. 137, 140 (1987); 20 C.F.R. § 416.920. First, the Commissioner determines whether a claimant is engaged in "substantial gainful activity"; if so, the claimant is not disabled. *Yuckert*, 482 U.S. at 140; 20 C.F.R. § 416.920(b).

At step two, the Commissioner determines whether the claimant has a "medically severe impairment or combination of impairments." *Yuckert*, 482 U.S. at 140-41; 20 C.F.R. § 416.920(c). If not, the claimant is not disabled. *Yuckert*, 482 U.S. at 141.

At step three, the Commissioner determines whether the impairment meets or equals "one of a number of listed impairments that the [Commissioner] acknowledges are so severe as to

3 - FINDINGS AND RECOMMENDATION

preclude substantial gainful activity." *Id.*; 20 C.F.R. § 416.920(d). If so, the claimant is conclusively presumed disabled; if not, the Commissioner proceeds to step four. *Yuckert*, 482 U.S. at 141.

At step four, the Commissioner determines whether the claimant can perform "past relevant work." *Yuckert*, 482 U.S. at 141; 20 C.F.R. § 416.920(e). If the claimant can work, he is not disabled; if he cannot perform past relevant work, the burden shifts to the Commissioner. *Yuckert*, 482 U.S. at 141. At step five, the Commissioner must establish that the claimant can perform other work that exists in significant numbers in the national economy. *Id.* at 142; 20 C.F.R. § 416.920(e), (f). If the Commissioner meets this burden, the claimant is not disabled. 20 C.F.R. § 416.966.

*ALJ'S Findings*

At step one of the sequential evaluation process outlined above, the ALJ found Theabolt had not engaged in substantial gainful activity since the alleged onset of disability date. (Tr. 28.) At step two, the ALJ determined Theabolt had the following severe impairments: Asperger's syndrome, anxiety, and depression. (*Id.*) At step three, the ALJ found Theabolt's impairments, either singly or in combination, did not meet or equal the requirements of a listed impairment. (Tr. 28-29.)

Next, the ALJ determined Theabolt had the residual functional capacity ("RFC") to perform a full range of work at all exertional levels with the following limitations: simple tasks with normal supervision for occasional redirection; no close work with co-workers; no interaction with the public; and the ability to wear surgical or other gloves in the performance of his job duties. (Tr. 29.) The ALJ also noted Theabolt would not be "significantly limited" in his ability to perform and remember very short and simple instructions. (*Id.*)

4 - FINDINGS AND RECOMMENDATION

At step four, the ALJ found Theabolt did not have any past relevant work.  (Tr. 37.)  At step

five, the ALJ determined Theabolt retained the ability to perform work as a nursery worker and a

laundry worker; thus, the ALJ found Theabolt not disabled, within the meaning of the Act.  (Tr. 38.)

*Discussion*

Theabolt alleges the ALJ erred by:  (1) rejecting the medical opinion of Dr. Daniel Scharf;

(2) rejecting functional limitations described by lay witness Leslie Wilkins; (3) rejecting lay witness

testimony from John Pank and Erin Balm; and (4) finding Theabolt not credible.

I.    Dr. Daniel Scharf

Theabolt argues the ALJ erred in partially rejecting the opinion of Dr. Daniel Scharf, an

examining physician.  (Pl.'s Br. 7-10.)  There are three types of medical opinions in social security

cases: those from treating, examining, and non-examining doctors. *Lester v. Chater*, 81 F.3d 821,

830 (9th Cir. 1995).  To reject the uncontroverted opinion of a treating or examining doctor, the ALJ

must present clear and convincing reasons for doing so. *Bayliss v. Barnhart*, 427 F.3d 1211, 1216

(9th Cir. 2005).  However, if a treating or examining doctor's opinion is contradicted by another

doctor's opinion, it may be rejected by specific and legitimate reasons. *Id.*  In either instance, the

ALJ is not required to accept an opinion that is brief, conclusory, or not supported by clinical

findings. *Id.*

On September 30, 2010, Dr. Scharf conducted a psychodiagnostic examination of Theabolt.

(Tr. 769-75.)  After reviewing Theabolt's medical records and conducting a mental status exam, Dr.

Scharf diagnosed Theabolt with Pervasive Developmental Disorder, rejecting a prior diagnosis of

Asperger's syndrome.  (Tr. 774.)  As a result of Theabolt's mental disorders, Dr. Scharf concluded,

*inter alia*, Theabolt would "most likely require special supervision . . . to sustain [an] ordinary work

routine."  (Tr. 774.)

5 - FINDINGS AND RECOMMENDATION

Despite the ALJ according Dr. Scharf's opinion "great" weight, the ALJ rejected Dr. Scharf's conclusion Theabolt would likely require special supervision to maintain regular work. (Tr. 36.)  In support of his conclusion, the ALJ cited Theabolt's volunteer experience and found Dr. Scharf's opinion "equivocal." (*Id.*)

Beginning in 2009, Theabolt volunteered as a greeter at the Oregon Museum of Science and Industry ("OMSI"). (Tr. 256.)  Although Theabolt was only scheduled to volunteer at OMSI four hours per week, Theabolt occasionally missed work, left early, or fell asleep during his shift. (*Id.*; *see also* Tr. 61 (testifying being overwhelmed at OMSI despite only volunteering four hours per week).)  While Theabolt's volunteer work establishes some minimum level of functioning, the volunteer work described does not contradict Dr. Scharf's impression that Theabolt "most likely" requires special supervision.  Indeed, Theabolt's supervisor at OMSI, Leslie Wilkins, noted while Theabolt "is willing to take direction," he also "occasionally requires coaching on what would seem to be basic work principles."[2] (Tr. 256.)  The skills Wilkins highlighted that could be developed by special coaching – calling when sick and providing advance notice of planned absences – are those necessary, as Dr. Scharf opined, to maintaining an "ordinary work routine." (*Compare* Tr. 256, *with* Tr. 774; *cf. also* Tr. 771 (noting oppositional problems in instructional settings and claimant's limited attendance at two specialized high schools).)  Accordingly, Theabolt's volunteer work does not contradict Dr. Scharf's opinion.

The ALJ rejected Dr. Scharf's limitation because it was equivocal – Dr. Scharf noted Theabolt would "most likely" need atypical supervision. (Tr. 36.)  As discussed above, even if Dr. Scharf used equivocal language, the evidence in the record amply demonstrates when Theabolt is in a work-like environment, he needs some degree of additional supervision.  Equivocal language

---

[2]The ALJ accorded "significant weight" to Wilkins' opinion. (Tr. 34-35.)

alone does not justify the ALJ's rejection of a medical opinion.[3]  *See, e.g.*, *Mitchell v. Astrue*, CV 06-52-0DW (PLA), 2010 WL 1486475, at \*9 (C.D. Cal. Mar. 3, 2010), *adopted by* 2010 WL 1462564 (C.D. Cal. Apr. 8, 2010) (noting an ALJ may properly discredit a medical opinion that is "equivocal, unsupported by clinical findings, *and* contradictory to the physician's own previous findings" (emphasis added)); *Thomas v. Barnhart*, 278 F.3d 947, 957 (9th Cir. 2002)); *Bacca v. Apfel*, C-98-3471 BZ, 1999 WL 587023, at \*2 (N.D. Cal. July 16, 1999) (rejecting equivocation as a sufficient basis for disregarding a physician's opinion where that opinion was not contradicted by the record).  Further, under the regulations, an ALJ is to consider, among other aspects, a medical opinion's consistency with the record and internal support.  *See* 20 C.F.R. § 416.927(c)(3)-(4). The Commissioner has not pointed to, and the court cannot locate, any evidence to undermine Dr. Scharf's opinion.  The evidence supporting Dr. Scharf's opinion derives from circumstances that are not equivalent to full-time, gainful employment, namely Theabolt's volunteer and school experiences; this fact serves to advance Theabolt's argument.  (Tr. 256 (reporting Theabolt's difficulties with volunteering *only four hours per week*).)  Accordingly, even if equivocal language was used by Dr. Scharf, his recommendation that Theabolt would "most likely" require special supervision is amply supported by the record.  In sum, the ALJ's partial rejection of Dr. Scharf's opinion is not supported by clear and convincing reasons and should not be accepted.

II.    Lay Witness Testimony

Theabolt next argues the ALJ improperly disregarded functional limitations described in Wilkins's testimony and improperly rejected the testimony of lay witnesses Jon Pank and Erin Balm.

---

[3]Theabolt argues the ALJ may only discount Dr. Scharf's opinion for clear and convincing reasons, (Pl.'s Br. 7-10); the Commissioner does not appear to dispute the application of this standard, (Def.'s Resp. 5-8).  Regardless, a physician's use of the phrase "most likely," without more, would not satisfy the lesser "specific and legitimate" standard.

An ALJ must determine the weight to give each source of evidence.  20 C.F.R. § 416.927(d).  The regulations define lay witnesses as "[o]ther sources."  *See* 20 C.F.R. § 416.913(d)(4).  An ALJ may discredit lay witness testimony by providing a "germane reason."  *Turner v. Comm'r*, 613 F.3d 1217, 1223-24 (9th Cir. 2010) (explaining an ALJ need only provide germane reasons to disregard lay witness testimony from "other sources").  To the extent that the ALJ partially rejected Ms. Wilkins' testimony and rejected Mr. Pank's and Ms. Balm's testimonies, the ALJ was required to provide germane reasons for doing so.

      A.    *Leslie Wilkins*

      Beginning in November 2009, Theabolt began volunteering for four hours per week as a greeter at OMSI.  (Tr. 256.)  Wilkins, OMSI's Volunteer Coordinator, supervised Theabolt when he was volunteering; she submitted a letter describing her experiences.  (*Id.*)  Generally, she described Theabolt as a "good volunteer," noting Theabolt performed his role "satisfactorily."  (*Id.*)  More specifically, however, Wilkins highlighted several issues she ascribed to Theabolt as "autistic."  (*Id*).  Wilkins noted Theabolt had trouble providing adequate notice when he would miss work due to illness or when he was anticipating missing work in the future, which were two areas Wilkins thought could be corrected through individual coaching.  (*Id.*)  Further, Wilkins described Theabolt's need to leave early or go to the break room when his routine was disrupted or he became anxious.  (*Id.*)  Additionally, Wilkins noted Theabolt occasionally fell asleep during his shift, which reflected poorly on his professionalism.  (*Id.*)

      The ALJ reviewed Wilkins's testimony and gave it "significant weight."  (Tr. 34-35.)  Although the ALJ described Wilkins's testimony as consistent with the record demonstrating Theabolt's "significant limitations from his mental impairments,"  he concluded her testimony did not demonstrate Theabolt "was precluded from all basic work activity."  (*Id.*)  Theabolt argues while

8 - FINDINGS AND RECOMMENDATION

the ALJ gave significant weight to Wilkins's testimony, the ALJ failed to incorporate the functional limitations described by Wilkins into the RFC.

If an ALJ finds testimony credible, he errs by failing to incorporate the limitations found in that testimony into the claimant's RFC and any subsequent VE hypothetical. *See Bruce v. Astrue*, 557 F.3d 1113, 1116 (9th Cir. 2009) (reversing an ALJ for failing to incorporate functional limitations described by a "generally credible" lay witness). Theabolt argues the ALJ erred in omitting from the RFC Wilkins's statement Theabolt required special supervision and could not complete a full shift because he became overwhelmed. (Pl.'s Br. 12-13.)

The Commissioner argues the ALJ's RFC is consistent with Wilkins's opinion because Wilkins concluded Theabolt "performed his volunteer role satisfactorily." (Tr. 256.) Theabolt's volunteer work with OMSI, however, did not require the same demands as full-time work; notably, Theabolt worked only four hours per week and missed work without prior notice and would end his shift early. (*Id.* (describing Theabolt's work habits).) Further, Wilkins made specific observations (dozing off on his shift, overwhelming anxiety requiring him to lay down) regarding Theabolt's capacity for work that conflict with the ALJ's RFC. The ALJ was not free to disregard those observations without comment. *See Bruce*, 557 F.3d at 1116 (finding the ALJ erred in failing to incorporate restrictions such as the claimant's "refusal to leave the bedroom, bathe, and eat" and "need to lie down for forty-five minutes . . . most days" into the VE hypothetical).

The ALJ found Theabolt is "capable of performing simple tasks with normal supervision for occasional redirection." (Tr. 29.) Wilkins, however, described Theabolt as "having challenges in his volunteer role" and needing "coaching . . . [on] basic work principles," including informing the employer of absences or calling when sick. (Tr. 256.) Additionally, the RFC does not incorporate Wilkins's comments regarding Theabolt's sleeping during his shifts. These work habits would be

9 - FINDINGS AND RECOMMENDATION

significant when demonstrated by a claimant working a full-time job; they are equally or more significant because Theabolt exhibited these difficulties while volunteering only four hours per week. Accordingly, the ALJ erred in giving Wilkins's testimony "significant weight" without also incorporating the limitations she described into the RFC. *See Bruce*, 557 F.3d at 1116.[4]

### B.    Jon Pank

Jon Pank, a licensed clinical social worker, treated Theabolt for more than five years, initially as the lead clinician in an adolescent day treatment program Theabolt attended. (Tr. 253.) On August 19, 2010, Pank submitted a letter to the ALJ. In the letter, Pank recounted Theabolt's clinical history and presentation with Asperger's syndrome. (*Id.*) Pank characterized Theabolt's academic and hygiene deficiencies as resulting from abnormal thought processes. For example, he described Theabolt's progress, both medically and in general, as hampered by Theabolt's "lack of self-care, self-discipline and limited ability to delay gratification." (Tr. 253.) Pank concluded Theabolt's abnormal thinking and "inability to take care of [himself] is not a conscious choice. It is a result of errors in thinking driven by [Theabolt's] Asperger's [s]yndrome." (Tr. 254.)

Pank also completed a Mental RFC Assessment form. (Tr. 723-32.) Pank opined, *inter alia*, that Theabolt demonstrated a moderate restriction in activities of daily living, marked difficulties in maintaining social functioning, and mild difficulties in maintaining persistence. (Tr. 730.) Pank described Theabolt as receiving substantial assistance from his parents with "basic things like

---

[4]Conversely, the concerns expressed by Wilkins about Theabolt's anxiety are adequately captured by the ALJ's RFC. Wilkins noted Theabolt occasionally must remove himself from interactions with the general public or particular coworkers when he becomes anxious. (Tr. 256 (noting a particular, anxiety-triggering coworker "is sometimes hard to understand and has a different routine than [Theabolt] prefers").) Because the RFC limits Theabolt's contact with the general public and his coworkers, his identified triggers, the RFC adequately captures the anxiety-related limitations Wilkins described.

laundry and hygiene," but he also noted that "even with coaching [Theabolt] refuses to take care of his teeth [and] clothes." (Tr. 732.)  Additionally, Pank described Theabolt's reliance on his parents as a buffer with authority figures, with whom Theabolt has a strained relationship.  (*Id.*)

Despite Pank's five year relationship with Theabolt, the ALJ reviewed Pank's opinion but gave it "little weight." (Tr. 35.)  The ALJ rejected Pank's opinion because it was internally inconsistent.  The ALJ compared Pank's note that Theabolt "can perform seemingly well" in response to Theabolt seeing "some material reward" with Pank's conclusion Theabolt could not be motivated to work even if his parents withdrew their financial support.  (*Id.* (citing Tr. 253-54).)

The ALJ's characterizes Pank's opinion as internally inconsistent.  However, a review of his opinion does not reveal any inconsistency.  (Tr. 253-54.)  Pank described Theabolt's sole source of motivation as striving for some material reward; however, and contrary to the ALJ's conclusion, Pank noted Theabolt's response to the promise of reward is often short-lived.  (Tr. 254 (Theabolt "can only do things that lead to relatively immediate tangible rewards *and then, not for long*.") (emphasis added).)  Indeed, as an example, Pank cited Theabolt's volunteer work with OMSI, which Theabolt described as motivated by free admission to the museum.  (Tr. 57, 253.)  Pank, however, further described Theabolt's volunteer work as lasting "for short periods," which is corroborated by the record.  (Tr. 256 (noting absences at Theabolt's volunteer position); Tr. 629 (noting Theabolt's three unnoticed absences from a computer-related internship and Theabolt's subsequent removal from the internship program).)[5]  Moreover, Pank gave other reasons, aside from Theabolt's

---

[5]Theabolt's vacillating motivation is consistent with discharge notes prepared by Pank in 2007.  (Tr. 630-31.)  Pank noted Theabolt's ability to be "resourceful, energized, and productive" when engaged, which contrasts with his lack of effort and attempts to sleep when disengaged.  (Tr. 631.)  Notably, Pank concluded Theabolt would be most successful in "a placement that understands his" mental disorders, which is at odds with the ALJ's conclusion that Theabolt's simply lacks motivation.

11 - FINDINGS AND RECOMMENDATION

motivation, why Theabolt would be unable to live independently.  For example, Pank noted Theabolt's refusal, without repeated prompting, to change his clothes even after "long periods of time" and Theabolt's attendant hygiene problems.  (Tr. 254, 732; Tr. 60 (noting Theabolt will wear the same clothes for weeks and must be reminded to shower and brush his teeth).)

The Commissioner argues Theabolt offers a different interpretation of the evidence, which the court must disregard in favor of the ALJ's interpretation.  *See Burch*, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").  As discussed above, however, the ALJ's conclusion that Pank's opinion is internally inconsistent is not supported by substantial evidence when Pank's opinion is considered as a whole. Despite the ALJ's characterization, Pank acknowledged Theabolt has periods of motivation but also described how those periods are fleeting in the face of Theabolt's abnormal thinking.  (Tr. 254 (concluding Theabolt's "inability to care for himself" is "a result of errors in thinking driven by his Asperger's Syndrome").)  Accordingly, the ALJ erred in giving Pank's opinion little weight.

C.    *Erin Balm*

Theabolt's mother, Erin Balm, completed a functional report and testified during the December 2010 hearing.  (Tr. 66-75, 211-18.)  Balm described Theabolt's limited ability to function independently, noting Theabolt cannot perform household chores and must be repeatedly reminded to conform to hygienic norms.  (Tr. 69, 212-13.)  Balm noted Theabolt's difficulties in interacting with others in person, and she described how Theabolt communicates with his friends primarily using a computer.  (Tr. 215-16.)  Despite the repeated efforts of Theabolt's counselors, Theabolt's functioning has not materially improved, and Balm does not believe Theabolt can live independently.  (Tr. 73-74.)

12 - FINDINGS AND RECOMMENDATION

The ALJ considered Balm's testimony, giving it "little weight." (Tr. 34.) The ALJ noted Balm's report conflicts with Theabolt's own testimony. (*Id.*) The ALJ also rejected Balm's testimony because she "appears to have been hyperbolic in her responses." *Id.*

The ALJ found a conflict between Theabolt's statement: "he does his own shopping and meal preparation independently," and Balm's statement Theabolt: "cannot manage money and only occasionally prepares meals for himself." (Tr. 34.) On February 26, 2009, Balm submitted a third-party functional report which stated: "How often does [the claimant] prepare food or meals? Hardly ever. (Top Ramen, Mac [and] Cheese)." (Tr. 213.) Balm also noted Theabolt "cannot manage money" because he "spend[s] it on whatever [is] wanted at the time and not on what is needed." (Tr. 214.)

On November 11, 2008, Theabolt saw medical provider Jill Russell who opined "[Theabolt] doesn't eat anything that is good for him," listing prepared foods such as ramen-style noodles and canned soups. This is the statement the ALJ attributes to Theabolt to support his rejection of Balm's statement. (Tr. 679.) The statements do not necessarily conflict. Balm described Theabolt's propensity to occasionally prepare food which Russell confirmed. To the extent Theabolt "buys his own food," Russell opined he made poor dietary choices. (*Id.*) Further, Theabolt's statements regarding chores are not directly contradicted by any of Balm's statements. (*Compare* Tr. 59-60 (testifying that Theabolt's parents do not given him chores but he consistently needs help on the rare occasions he does laundry), *with* Tr. 213 (noting Theabolt "does not do chores" but he "needs help" with laundry).)

The Commissioner argues Theabolt offers an alternative interpretation of the evidence, and the court must defer to the ALJ's interpretation. (Def.'s Resp. 11.) The existence or non-existence of a contradiction, however, does not depend on evidentiary interpretations; instead, the validity of

13 - FINDINGS AND RECOMMENDATION

the ALJ's statement, at least in this instance, may be directly verified.  Because there is no contradiction between Theabolt's testimony and Balm's testimony, the court does not need to reinterpret the evidence.  Accordingly, the ALJ's first reason for disregarding Balm's testimony is not supported by the evidence.

The ALJ also rejected Balm's testimony because "she appears to have been hyperbolic in her responses."  (Tr. 34.)  Balm reported Theabolt can only walk a "couple of blocks" before he needed to rest fifteen to twenty minutes.  (Tr. 216.)  There is no evidence in the record Theabolt complained of or suffers from any exertional limitations.  The Commissioner argues this is a germane reason to reject Balm's testimony because no medical evidence establishes any physical limitations, and "lay testimony must always be consistent with medical evidence and cannot establish limitations contradicted by the medical record."  (Def.'s Resp. 12.)[6]  The ALJ did not, however, rely on any inconsistency between Balm's testimony and the medical evidence.  Rather, the ALJ rejected Balm's testimony based upon one example which the ALJ described as "hyperbolic."  Theabolt contends this is not a strong reason for discounting all of Balm's testimony, particularly because there does not appear to be any other instances of hyperbolic statements.  While the court agrees, the standard for discounting a lay witness' testimony is low.  *See, e.g., Bruce*, 557 F.3d at 1115 (noting an ALJ must provide "reasons that are germane to each witness [and] the

_____

[6]In support of this argument, the Commissioner cites *Lewis v. Apfel*, 236 F.3d 503 (9th Cir. 2001), which held that an ALJ may disregard lay testimony that conflicts with the medical evidence. *Id.* at 511-12 (affirming the ALJ's rejection of lay testimony that reported side effects not mentioned in the medical record). In *Bruce*, however, the court held an ALJ could not discredit the lay witness's testimony "as not supported by the medical evidence in the record." *Bruce*, 557 F.3d at 1116 (citing *Smolen v. Chater*, 80 F.3d 1273, 1289 (9th Cir. 1996)). Because the ALJ cited Balm's hyperbole rather than contradiction with the medical evidence, the court need not resolve this conflict. *See generally Glover v. Astrue*, 835 F. Supp. 2d 1003, 1006-12 (D. Or. 2011) (resolving the conflicting holdings and finding *Lewis* controlling) (citing *Bond v. Astrue*, No. ED CV 10–00106 RZ, 2010 WL 4272870 (C.D. Cal. Oct. 25, 2010)).

14 - FINDINGS AND RECOMMENDATION

reasons germane to each witness must be specific").  Moreover, Theabolt's explanation for Balm's statement, while plausible, asks the court to substitute its interpretation of this evidence for the ALJ's reasonable interpretation.  Because the Court may not do so, the ALJ's rejection of Balm's testimony is not error.  *See Burch*, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

III.    Theabolt's Credibility

Theabolt argues the ALJ erred in finding him not credible.  When a claimant has medically documented impairments that could reasonably be expected to produce some degree of the symptoms complained of, and the record contains no affirmative evidence of malingering, "the ALJ can reject the claimant's testimony about the severity of . . . symptoms only by offering specific, clear and convincing reasons for doing so."  *Smolen v. Chater*, 80 F.3d 1273, 1281 (9th Cir. 1996).

A general assertion plaintiff is not credible is insufficient; the ALJ must "state which . . . testimony is not credible and what evidence suggests the complaints are not credible."  *Dodrill v. Shalala*, 12 F.3d 915, 918 (9th Cir. 1993).  The reasons proffered must be "sufficiently specific to permit the reviewing court to conclude the ALJ did not arbitrarily discredit the claimant's testimony."  *Orteza v. Shalala*, 50 F.3d 748, 750 (9th Cir. 1995).  If, however, the "ALJ's credibility finding is supported by substantial evidence in the record, [the reviewing court] may not engage in second-guessing."  *Thomas*, 278 F.3d at 959.

The ALJ may consider objective medical evidence and the claimant's treatment history, as well as the claimant's daily activities, work record, and observations of physicians and third parties with personal knowledge of the claimant's functional limitations.  *Smolen*, 80 F.3d at 1284.  The Commissioner recommends assessing the claimant's daily activities; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and

15 - FINDINGS AND RECOMMENDATION

aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; and any measures other than treatment the individual uses or has used to relieve pain or other symptoms. *See* SSR 96-7p, *available at* 1996 WL 374186.

Further, the Ninth Circuit stated an ALJ also "may consider . . . ordinary techniques of credibility evaluation, such as the claimant's reputation for lying, prior inconsistent statements concerning the symptoms . . . other testimony by the claimant that appears less than candid [and] unexplained or inadequately explained failure to seek treatment or to follow a prescribed course of treatment." *Smolen*, 80 F.3d at 1284. The ALJ may not, however, make a negative credibility finding "solely because" the claimant's symptom testimony "is not substantiated affirmatively by objective medical evidence." *Robbins v. Soc. Sec. Admin.*, 466 F.3d 880, 883 (9th Cir. 2006).

Theabolt primarily complains of mental health deficits resulting from Asperger's syndrome, anxiety, and depression. (Tr. 48-49, 197.) Theabolt was 20 years old at the time of the hearing, and he has never attempted to work or live outside of his parents' home. (Tr. 50-51.) Although Theabolt did not graduate from high school despite an individualized education plan ("IEP"), special education classes, and placement in a special education school, Theabolt ultimately obtained his GED in 2009, after receiving several accommodations for his disabilities. (Tr. 52-54.) Theabolt described difficulty starting assignments because he becomes overwhelmed by the process. (Tr. 53.) Theabolt attributed his inability to routinely complete assigned work and participate in school to his anxiety. (Tr. 55; *see also* Tr. 57 (noting similar problems with anxiety at his volunteer position with OMSI).)

16 - FINDINGS AND RECOMMENDATION

In addition to mental health issues, Theabolt reported insomnia resulting in difficulty remaining awake during the day. (Tr. 55-56.) Theabolt's daytime sleep was also a method for him to cope with anxiety; when Theabolt was unable to remove himself from a triggering environment, such as classes at school, he would put his head on his desk and sleep. (Tr. 56.) Additionally, Theabolt was occasionally permitted to wear his headphones in class, which was another coping mechanism. (*Id.*; *see also* Tr. 64 (describing Theabolt's use of sunglasses to moderate social anxiety).) In response to a question from the ALJ, Theabolt denied he could perform full-time work because he gets easily overwhelmed, noting his limited success volunteering four hours per week at OMSI. (Tr. 61.)

The ALJ considered Theabolt's testimony but found his "statements concerning the intensity, persistence and limiting effects of [his] symptoms are not credible to the extent they are inconsistent with the [given] residual functional capacity assessment." (Tr. 30.) In support of the negative credibility finding, the ALJ offered several reasons. The ALJ noted the objective medical evidence does not corroborate Theabolt's report of symptoms or support his theory for being unable to work; indeed, the medical evidence demonstrates Theabolt's functional improvement with treatment. (Tr. 31, 34. 37.) Further, the ALJ concluded Theabolt's alleged disabling functional limitations arise from defects in Theabolt's motivation, which varies with extraneous factors. (Tr. 36.) The ALJ also cited Theabolt's volunteer experience as contradictory to Theabolt's alleged functional limitations. (Tr. 37.) Regarding Theabolt's alleged insomnia and fatigue, the ALJ found Theabolt has never sought medical treatment for that condition. (*Id.*)

As an initial matter, Theabolt challenges the ALJ's use of particular language in his decision: "the claimant's medically determinable impairments could reasonably be expected to cause some of the alleged symptoms; however, the claimant's statements concerning the intensity, persistence

17 - FINDINGS AND RECOMMENDATION

and limiting effects of these symptoms of are not credible to the extent they are inconsistent with the [given] residual functional capacity." (Pl.'s Br. at 20-21 (citing Tr. 30).) Theabolt argues the District of Oregon has "consistently rejected this boilerplate" because the language is insufficiently specific and is not a clear and convincing reason for an adverse credibility finding. (*Id.*) As Theabolt's citation of cases demonstrates, this District is not unfamiliar with a challenge to the boilerplate language. (*See id.* at 20 n.7 (collecting cases).) Although Oregon cases are not uniform in their approach, where the ALJ gives other reasons for his or her credibility finding, these decisions generally do not require reversal on that ground alone.[7] The ALJ's recitation of the boilerplate here was merely a conclusion, which the ALJ supported with reasons scattered throughout his decision. Accordingly, the ALJ did not err in using the boilerplate language, and the decision should not be reversed on that ground alone. *Veach v. Comm'r Soc. Sec. Admin.*, 3:12-CV-00679-MA, 2013 WL 3479508, at *5 (D. Or. July 10, 2013); *Link v. Astrue*, 3:11-CV-01025-JE, 2012 WL 5037029, at *7-8 (D. Or. Oct. 16, 2012). The ALJ's credibility finding must instead be evaluated on the strength of the several reasons he offered.

The ALJ found Theabolt's statement that he is "incapable of work" was not credible as Theabolt's statement regarding work was the result of factors other than his mental impairments. (Tr. 36 (citing Tr. 771).) Theabolt argues the ALJ erred because Theabolt's inability to work results

---

[7]For example, in cases where the court characterized the use of this language as an error, the court went on to consider the ALJ's other proffered reasons. *See, e.g.*, *Brooks v. Astrue*, 3:10-CV-01002-MO, 2011 WL 4828820, at *2-5 (D. Or. Oct. 3, 2011); *see also Tilton v. Astrue*, 6:10-CV-1151-SI, 2011 WL 4381745, at *11-12 (D. Or. Sept. 20, 2011) (finding error when the boilerplate "is the only sentence in the decision that directly addresse[d the claimant's] credibility"). More recent cases decline to characterize the ALJ's use of the boilerplate language as error when it is not the sole expression of the ALJ's support for his or her credibility determination. *See, e.g.*, *Veach v. Comm'r Soc. Sec. Admin.*, 3:12-CV-00679-MA, 2013 WL 3479508, at *5 (D. Or. July 10, 2013); *Link v. Astrue*, 3:11-CV-01025-JE, 2012 WL 5037029, at *7-8 (D. Or. Oct. 16, 2012).

from lack of motivation – termed "avolition" by American Psychiatric Ass'n Diagnostic &
Statistical Manual of Mental Disorders 301 (4th ed. 2000, text revision) – and is documented
throughout the record.  The ALJ did not find Theabolt is free from avolition; rather, the ALJ
concluded Theabolt's medically determinable impairments only accounted for some of Theabolt's
lack of motivation.  (Tr. 36.)  The ALJ found the support offered by Theabolt's parents caused the
diminution in Theabolt's motivation to work.  (*Id.*)

The record reveals Theabolt's motivation problems are a result of "errors in thinking driven
by his" mental impairments, *i.e.*, Asperger's syndrome, anxiety and depression.  (Tr. 254.)  The
medical record supports the conclusion Theabolt's avolition results at least in part from his mental
impairments.  (Pl.'s Br. 21-22.)  The ALJ inferred Theabolt's lack of motivation to work was, in
significant part, driven by factors other than his mental impairments and that Theabolt's functional
limitations are not as significant and limiting as alleged.  *See Tommasetti v. Astrue*, 533 F.3d 1035,
1040 (9th Cir. 2008) (affirming an ALJ's credibility finding based in part on the claimant's large
financial reserve, which may have influenced the claimant's decision to find work); *Thomas*, 278
F.3d at 959 (affirming an ALJ's finding that poor work history and "little propensity to work"
negatively affected a claimant's credibility).  The medical evidence, when it mentions avolition,
does not rule out additional factors suggested by the ALJ.[8]  However, the ALJ's reason to find
Theabolt not credible is not supported by clear and convincing evidence and is, in fact, contradicted

---

[8]The ALJ also noted Theabolt had not sought vocational rehabilitation services or
attempted to find employment.  (Tr. 36.)  Theabolt obtained vocational rehabilitation services on
July 11, 2011.  (Tr. 787-91.)  This evidence was properly submitted to and considered by the
Appeals Council, and, as a part of the Administrative Record, must be considered by the court in
determining whether the ALJ' decision is supported by substantial evidence.  *See Taylor v.
Comm'r of Soc. Sec. Admin*, 659 F.3d 1228, 1231-33 (9th Cir. 2011).  Here, Theabolt's later-
submitted evidence shows impediments to employment as Theabolt lacking in interpersonal and
work skills, self-direction, including "inability to carry out activities required for independent
living or work."  (Tr. 790.)

by the medical evidence. (Tr. 724, 774.) Accordingly, the ALJ's rejection of Theabolt's credibility is error.

The ALJ also discounted Theabolt's statement he could not work full-time "because of a lack of concentration," as that statement was contradicted "by recent psychological testing."[9] (Tr. 37.) In the hearing, the following colloquy took place between Theabolt and his attorney:

> Do you feel that you would be able to go to [full-time] work . . . while on your medicine? Does [your medicine] help enough for you to be able to concentrate on a job? Probably not. Okay. Why not? Because I get overwhelmed at [OMSI] and that's only four-hours a week.

(Tr. 61.) Due to the compound question, it is not readily clear what Theabolt intended to convey. In fact, Theabolt does not argue lack of concentration precludes him from full-time work. Rather, Theabolt argues he becomes overwhelmed and this precludes him from full-time work. Because the ALJ "may not discredit the claimant's testimony as to the severity of symptoms merely because they are unsupported by objective medical evidence," the ALJ could not rely solely on the mental status exam to discount plaintiff's subjective complaints. *See Reddick v. Chater*, 157 F.3d 715, 722 (9th Cir. 1998).

The Commissioner argues the ALJ accepted and addressed the possibility the Theabolt becomes overwhelmed by incorporating it into the RFC limiting Theabolt's contact with the public and coworkers. (Tr. 29 (finding Theabolt "should not work closely with coworkers, and he should have no interaction with the public while at work").) Theabolt's reference to becoming

---

[9]The "recent psychological testing" cited by the ALJ was the psychodiagnostic examination performed by Dr. Scharf. (Tr. 37 (citing Tr. 774).) From a mental status exam performed during the examination, Dr. Scharf found Theabolt had mild disruption in concentration and attention and had moderate difficulties with persistence. (Tr. 773, 774.) The regulations described psychological tests as "medical signs" and "laboratory findings," 20 C.F.R. § 416.928(b), (c), which are in turn considered "objective medical evidence," 20 C.F.R. § 416.929(a).

overwhelmed is explicitly connected to his volunteer work at OMSI. (Tr. 61 ("Because I get overwhelmed at [OMSI] and that's" only four hours per week.").) Theabolt references Wilkins statement which gives a more detailed picture of what overwhelmed Theabolt during his volunteer work at OMSI. (Tr. 256.) Wilkins ascribed Theabolt's feelings of being overwhelmed to anxiety caused by the public or particular coworkers. (Id.) The ALJ accepted Theabolt's testimony in this regard and incorporated a limitation in the RFC, and consistent with Theabolt's testimony. Accordingly, the ALJ's interpretation of the evidence regarding Theabolt's self-described limitation of being overwhelmed is reasonable and the court should not substitute another interpretation. *See Burch*, 400 F.3d at 679 ("Where evidence is susceptible to more than one rational interpretation, it is the ALJ's conclusion that must be upheld.").

As discussed above, Theabolt challenges three discrete aspects of the ALJ's credibility determination: (1) the boilerplate language; (2) the rejection of his testimony regarding his lack of motivation to work; and (3) the rejection of his testimony regarding being overwhelmed. (Pl.'s Br. 19-23.) The ALJ's credibility determinations regarding the boilerplate language and Theabolt's credibility regarding being "overwhelmed" were either legally sufficient or supported by clear and convincing evidence. However, the ALJ erred in rejecting Theabolt's credibility based on testimony that Theabolt lacked motivation. This significantly impacted the ALJ's opinion and is not sufficiently addressed in Theabolt's RFC, especially regarding "normal" supervision.

IV.   Remand

The decision whether to remand for further proceedings or for immediate payment of benefits is within the discretion of the court. *Harman v. Apfel*, 211 F.3d 1172, 1178 (9th Cir. 2000). The issue turns on the utility of further proceedings. A remand for an award of benefits is appropriate when no useful purpose would be served by further administrative proceedings or when

21 - FINDINGS AND RECOMMENDATION

the record has been fully developed and the evidence is insufficient to support the Commissioner's decision. *Strauss v. Comm'r*, 635 F.3d 1135, 1137-38 (9th Cir. 2011) (quoting *Benecke v. Barnhart*, 379 F.3d 587, 593 (9th Cir. 2004)). The court may not award benefits punitively and must conduct a "credit-as-true" analysis to determine if a claimant is disabled under the Act. *Id.* at 1138.

Under the "credit-as-true" doctrine, evidence should be credited and an immediate award of benefits directed where: (1) the ALJ has failed to provide legally sufficient reasons for rejecting such evidence; (2) there are no outstanding issues that must be resolved before a determination of disability can be made; and (3) it is clear from the record the ALJ would be required to find the claimant disabled were such evidence credited. *Benecke*, 379 F.3d at 593. The "credit-as-true" doctrine is not a mandatory rule in the Ninth Circuit, but leaves the court flexibility in determining whether to enter an award of benefits upon reversing the Commissioner's decision. *Connett v. Barnhart*, 340 F.3d 871, 876 (9th Cir. 2003) (citing *Bunnell v. Sullivan*, 947 F.2d 341, 348 (9th Cir. 1991) (*en banc*)). The reviewing court should decline to credit testimony when "outstanding issues" remain. *Luna v. Astrue*, 623 F.3d 1032, 1035 (9th Cir. 2010).

As discussed above, the ALJ erred in: (1) rejecting Dr. Scharf's opinion that Theabolt would occasionally require special supervision; (2) omitting Wilkins's testimony Theabolt requires special supervision and occasionally falls asleep during his volunteer shifts; and (3) rejecting Pank's opinion; and (4) rejecting Theabolt's statement about lack of motivation. Theabolt argues the proper course of action with respect to Pank's opinion is remanding for further proceedings, (Pl.'s Br. 16); however, Theabolt argues Dr. Scharf's opinion and Wilkins's opinion, when credited, establish Theabolt's disability. (Pl.'s Br. 10-11; Pl.'s Reply 6-9.)

When crediting the erroneously rejected testimony in this case as true, and when including and accepting the limitations presented by that testimony in the RFC, a remand for further

22 - FINDINGS AND RECOMMENDATION

proceedings would result in a finding of disability. The VE testified to several different hypotheticals that would leave a claimant unemployable.[10] The decision in *Benecke* holds that a VE's testimony need not "address the precise work limitations established by the improperly discredited testimony." 379 F.3d at 595. Wilkins and Dr. Scharf both testified Theabolt would need some form of additional supervision to maintain competitive employment. (Tr. 256, 774.) The VE testified a claimant requiring "special supervision to sustain an ordinary work routine" would be unemployable. (Tr. 77-78.) The court finds there are no outstanding issues that must be resolved before a determination of disability can be made. *Benecke*, 379 F.3d at 594-95. Thus the court will credit as true the erroneously rejected evidence. As set forth above, if the VE were presented with a RFC that captures all of Theabolt's limitations, a finding of disability would be compelled.

### Conclusion

For the foregoing reasons, the Commissioner's decision should be REVERSED and this case should be REMANDED for an award of benefits consistent with this Findings and Recommendation.

### Scheduling Order

The above Findings and Recommendation will be referred to a United States District Judge for review. Objections, if any, are due **November 21, 2013**. If no objections are filed, review of the Findings and Recommendation will go under advisement on that date.

---

[10]The VE testified a claimant whose productivity was reduced to "80 percent of that expected of a worker" would be unemployable. (Tr. 77.) The VE also testified a claimant who would be absent from work at least two days per month would be unemployable. (*Id.*) Finally, the VE testified a claimant requiring "special supervision to sustain an ordinary work routine" would be unemployable. (Tr. 77-78.)

If objections are filed, a response to the objections is due fourteen days after the date the objections are filed and the review of the Findings and Recommendation will go under advisement on that date.

DATED this 4th day of November, 2013

/s/ Patricia Sullivan
Patricia Sullivan
United States Magistrate Judge